El Pueblo de Puerto Rico, demandante y apelado, *v.* William S. Duell, acusado y apelante.

No. 3816.—*Sometido:* Enero 17, 1930. *Resuelto:* Mayo 26, 1931.

---

\* Nota: Véase el prefacio.

*Henry G. Molina,* abogado del apelante; *R. A. Gómez,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR ALDREY, emitió la opinión del tribunal.

William S. Duell apela de una sentencia que lo condena a seis meses de prisión por infracción al artículo 328 del Código Penal, como fué enmendado en 1916, porque por imprudencia temeraria, negligencia o descuido dejó e hizo que un automóvil "Mercedes" que guiaba en determinada fecha y sitio chocase con otro automóvil "Chevrolet", causando así la muerte de José María Tirado.

Dos son los motivos que alega en apoyo de su recurso: primero, que la corte inferior cometió error al declarar sin lugar su moción de *nonsuit;* segundo, que también cometió error al declararlo culpable porque de acuerdo con la evidencia no cometió delito alguno.

Desestimada por la corte inferior la moción del acusado para que lo absolviera por no ser suficiente la prueba presentada por el fiscal para dictar sentencia condenatoria (*nonsuit*), el apelante presentó prueba y por esto renunció a que sea considerada esa moción. *El Pueblo* v. *Alvarado,* 19 D.P.R. 870; *El Pueblo* v. *González,* 24 D.P.R. 713, y *El Pueblo* v. *Ojeda,* 26 D.P.R. 438. Por consiguiente, examinaremos toda la prueba presentada en el juicio para resolver si se cometió el segundo de los errores alegados.

Un automóvil "Mercedes" guiado por el apelante caminaba poco después de las doce de la noche de una determinada fecha desde San Juan para Río Piedras y al lle-

gar al sitio donde está la Parada 30 de los carros eléctricos chocó con otro automóvil "Chevrolet" que estaba detenido en la carretera a la derecha de ella, en la misma dirección que llevaba el "Mercedes". Como consecuencia de ese accidente resultó muerto José María Tirado y otra persona, Jorge Luis Rivera, con heridas en la cara.

Según declaró Jorge Luis Rivera él y José María Tirado habían estado de paseo esa noche en el "Chevrolet" y cuando se retiraban para Río Piedras detuvieron el automóvil cerca de la Parada 30 de los carros eléctricos para arreglar la luz trasera que se les apagaba, a fin de evitar una multa, y dejaron detenido el "Chevrolet" en el lado derecho de la carretera yendo para Río Piedras, casi perpendicularmente a ella, con sus ruedas delanteras sobre el paseo de la carretera y con las traseras hacia la cuneta y vía de los carros eléctricos que está cercana; que a la derecha del automóvil como quedó situado había un árbol de mango y luego otro en la misma dirección hacia Río Piedras; que aquel sitio estaba claro por estar alumbrado con dos bombillas eléctricas, una en la carretera y otra en la vía de los carros eléctricos; que cuando Tirado y él bajaron del "Chevrolet" quedaron los focos delanteros del automóvil encendidos; que no oyó bocina ni vió luces de otro automóvil pero casi al momento de haber bajado llegó un automóvil de San Juan y chocó con el "Chevrolet", no sabiendo nada más después por haber quedado sin conocimiento; y que a los dos o tres días fué con el juez municipal a aquel sitio y vió al "Chevrolet" con el frente para la carretera al otro lado del árbol.

Juan Martínez, que es sereno de aquel barrio, declaró que fué el primero en llegar al sitio del suceso, al que acudió después otro automóvil "Oakland" y luego otro con el Sr. Izquierdo; que él se hallaba frente a la casa de Panzardi, que está entre Río Piedras y la Parada 30, no muy lejos de ésta, y vió un automóvil que se detuvo en la Parada 30, que quedó como una yarda en la carretera y que

tenía sus luces encendidas, del que bajaron dos muchachos y a los pocos momentos llegó de la dirección de San Juan otro automóvil "a velocidad demasiado exagerada" que chocó con el automóvil que estaba detenido, que era un "Chevrolet"; que el automóvil que produjo el choque quedó detenido como a cinco o seis yardas después, siendo un "Mercedes"; que en aquel sitio hay dos bombillas eléctricas y que fué a buscar un policía, regresando poco después con Juan A. Lebrón, quien llevó los heridos al hospital de Río Piedras; que el "Chevrolet" después del choque estaba encima de la vía al otro lado del árbol de mango y él con el policía lo echó para adelante para que no estorbara el paso de los carros eléctricos; y que el árbol estaba raspado.

El policía insular Juan A. Lebrón declaró que el "Mercedes" estaba detenido como a seis. u ocho metros; que Tirado tenía el parachoques trasero (*bumper*) encima de su cuerpo y que el árbol de mango estaba raspado.

El abogado don Benicio Sánchez vive casi enfrente de aquel sitio y declaró que allí la luz es clara. Don Rafael Izquierdo, que llegó al sitio del suceso pocos momentos después, dijo que encontró al "Chevrolet" con las luces delanteras encendidas..

Según el perito mecánico Felipe Cuevas el "Chevrolet" resultó con un fuerte golpe en el lado derecho, parte trasera, de la caja; el guardalodo izquierdo con una pequeña abolladura; la rueda derecha rota ("desgranada"); el guardalodo derecho también estaba fuertemente abollado y el estribo derecho un poco deformado, teniendo también un desperfecto en los cristales. El no vió el "Mercedes".

Otro perito mecánico, Antonio Lugo, vió ambos automóviles y dijo que el "Chevrolet" tenía la rueda derecha trasera rota ("desgranada") y hecha pedazos, lo que demos· traba un golpe muy fuerte; en el lado trasero izquierdo se le había desprendido el parachoques (*bumper*) y el aro desmontable que llevaba en la caja de atrás; cree que la razón

de eso debe ser que al recibir el golpe en el lado izquierdo y al ladear un poco sobre la carretera, según las demostraciones que indica el automóvil, se conoce que patinó el "Chevrolet" después de haber recibido el choque; que el estribo del lado derecho tenía una parte doblada hacia abajo; que la punta del *chassis* estaba estropeada y el parachoques (*bumper*) y el aro estaban en el suelo; que en el lado derecho, a la altura del estribo y de la capota, aparecen dos golpes en un árbol de mango que había allí; que la parte delantera del lado derecho también tenía un golpe y estaba algo desprendida. Teniendo en cuenta este perito que el automóvil "Mercedes" tiene los mejores materiales que pueden darse, que es un carro pesado y muy fuerte, que tiene los guardalodos de acero laminado, que tiene cuatro frenos y que es lo mejor terminado y bien construído, pudiendo con sus frenos detenerse a no más de cinco o seis metros caminando a 50 o 60 millas; y teniendo en cuenta también que el "Chevrolet" es un automóvil completamente liviano y que sus guardalodos son de lata ordinaria, llegó a la conclusión de que fué un choque violento necesariamente porque en la forma que está construído el parachoques trasero del "Chevrolet", que es casi un medio círculo y que en la parte donde tuvo que dar para romperlo es muy resistente, todo eso le demostraba que el choque fué muy violento. También dijo que el "Mercedes" tiene dos aceleradores, uno que marca hasta 60 millas y el otro hasta 120; que puede desarrollar hasta noventa millas; que es un carro pesado, y que yendo una persona a sesenta millas cree que en otro carro va a veinte, que en los pesados no se nota la velocidad aunque vaya a cincuenta o sesenta millas por hora, y que para ocurrir ese choque en condiciones tan violentas debía caminar el "Mercedes" de cuarenta a cincuenta millas por hora, por lo menos. Que el "Mercedes" tenía la punta del guardalodo derecho doblada y el parachoques (*bumper*) derecho se cayó con el golpe, apareciendo en el radiador un golpe no muy fuerte.

Esa fué, en resumen, la prueba presentada en el juicio por el fiscal.

El apelante declaró que esa noche había estado en una fiesta (*party*) y a las doce llevaba dos señoritas para Caguas, de donde tenía que regresar para una casa en la carretera de Río Piedras a Carolina; que iba hablando con la señorita que estaba en el asiento delantero pero que miraba hacia adelante; que el "Mercedes" tiene tres juegos de luces y él utilizaba el *"double deem"* que no alumbra tanto como los focos completos, y señaló en el juicio así "de aquí al final de esa mesa"; que vió al "Chevrolet" de repente a unos diez pies de distancia, cuando estuvo dentro del radio de luz de sus focos y apenas tuvo tiempo para darle vuelta al guía y llegar a los frenos, no pudiendo tocar la bocina; que chocó de medio lado y paró el "Mercedes" a muy poca distancia; que aquel sitio estaba oscuro y el "Chevrolet" no tenía luces encendidas estando colocado en posición oblicua con su frente más cerca de San Juan; que iba a una velocidad moderada de 35 a 40 millas por hora; que el "Mercedes" le dió al "Chevrolet" en el guardalodo trasero y le hizo dar una vuelta llevando la parte delantera del automóvil al frente de la carretera, dándole una vuelta completa; y que detuvo el "Mercedes" a 40 pies.

La otra prueba del apelante tendió a demostrar que el sitio del suceso estaba obscuro; que el sereno no podía ver desde frente a la casa de Panzardi lo que dice que vió; y con la declaración de la señorita que iba en el asiento delantero del "Mercedes", así como con la de otra persona que guiaba el automóvil "Oakland" que llegó después y que con ellos había estado en la fiesta (*party*) intentó demostrar que el "Mercedes" iba corriendo a 25 millas por hora; que el "Chevrolet" tenía su frente a San Juan con la parte trasera dentro de la carretera y que no tenía encendidos sus faroles. Estos dos testigos, que habían manifestado en el juicio que el "Mercedes" iba a 25 millas, reconocieron declaraciones escritas por ellos en las que manifestaron que el "Merce-

des'' caminaba a 30 millas. Un perito de la defensa dijo que lo más probable es que el ''Mercedes'' no viera al ''Chevrolet'', que le diera por la parte trasera derecha y que el golpe debió ser fuerte. Casi todos los testigos explicaron en el juicio a la corte con una libreta en la mesa la posición del ''Chevrolet''; se practicó inspección ocular sin que el juez hiciera constar lo que vió el día del juicio y se presentaron fotografías y un plano.

Lo expuesto es un resumen de lo esencial de la prueba contenida en 330 folios.

Como se ve, la prueba en parte es contradictoria pero ese conflicto fué resuelto por la corte inferior en **contra del** apelante y no encontramos que cometiera error en esa decisión, tanto más cuanto que muchos testigos señalaban distancias ante la corte refiriéndose a ciertos sitios de su salón sin que en la transcripción de la prueba aparezca en números cuáles eran esas distancias, y lo mismo ocurrió casi todas las veces que gráficamente demostraban ante la corte la colocación del ''Chevrolet'' con una libreta en representación del automóvil.

Hay ciertos hechos admitidos por el apelante, como son que el ''Mercedes'' que él guiaba chocó con el ''Chevrolet'' que estaba detenido a la derecha de la carretera; que Tirado murió como consecuencia del choque; que siendo un sitio oscuro, según él dice, no llevaba encendidas sus mejores luces; que no vió el ''Chevrolet'' hasta estar a unos diez pies de distancia de él, cuando estuvo dentro del radio de las luces que llevaba; que caminaba a 35 o 40 millas por hora, que equivalen a 56 o 64 kilómetros, que exceden de los 48 kilómetros que la ley de automóviles fija como evidencia *prima facie* de que un automóvil es conducido sin el debido cuidado; y que no tuvo tiempo de tocar la bocina. Hay otros que son muy elocuentes por sí mismos, como son que el golpe debió ser causado llevando el ''Mercedes'' mucha velocidad, de 60 millas, o por lo menos de 40 a 50 millas, según declaró el perito Lugo, necesaria para que el ''Chevro-

let'' cambiara de posición dando una vuelta al árbol de mango que tenía al lado y para que sufriera tan grandes desperfectos.

*Entendemos que la prueba en conjunto es suficiente para sostener la sentencia condenatoria impuesta en este caso y que debe ser confirmada.*